UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JAMES ROBINSON,<br><br>       *Defendant*. | Criminal Action No. 1:20-cr-00214 (CJN) |

**MEMORANDUM OPINION**

James Robinson is charged with unlawful possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1). *See generally* Indictment, ECF No. 5. He moves to suppress evidence of his arrest, officers' subsequent identifications of him, and the firearm and ammunition at issue in this case. *See generally* Def.'s Omnibus Mot. to Suppress ("Def.'s Mot."), ECF No. 24. Because Robinson has not established a violation of his Fourth Amendment rights or that the officers' identifications were impermissibly suggestive, his Motion is denied.

**I.**      **Background**

On September 29, 2020, Officer Kelly of the Metropolitan Police Department's Narcotics and Special Investigations Division Gun Recovery Unit ("GRU") observed an Instagram Live video broadcasted by user "bigcuddy_bigbob_cp13." Compl. SOMF at 1 ("SOMF"), ECF No. 1-1; Tr. 18:13–14, ECF No. 38. The individual depicted in the video was "a black male wearing a white crew neck sweatshirt, dreadlock style hair, designer sunglasses, a necklace, and blue jeans with a red stripe," with a black magazine floorplate tucked into the front of his jeans. SOMF at 1. Officer Kelly recognized the individual as James Robinson, who was known to frequent the Congress Heights neighborhood. *Id.* Officer Kelly notified other GRU officers and gave a

1

"lookout" for an individual in "long dreads, . . . a white sweatshirt, [and] Cartier glasses." Tr. 21:11–12.

The GRU officers responded to Congress Heights in two unmarked cars, Tr. 18:21–19:4, but did not see Robinson and eventually left, *id.* 21:15–19. A short time later, Officer Kelly saw a second Instagram Live video again depicting Robinson in the Congress Heights area. SOMF at 1. The officers returned to the neighborhood and saw Robinson sitting in front of the apartment building located at 3409 13th Place Southeast. *Id.* Three officers (Kelly, Jacobs, and Davies) exited the first GRU car and approached Robinson, who fled into the apartment building while holding his waistband. *Id.* 22:13–23:12. Those officers ran in after him and heard Robinson run to the top floor. Tr. 30:2–7. Officer Davies—the first officer into the building—heard a door slam followed by a loud metal noise, *id.,* and upon climbing the stairs, noticed the door handle to Apartment 302 lying on the floor, *id.* The officers knocked on the door to that apartment and announced themselves. Gov't Ex. 11.

At approximately the same time, two other officers (Hiller and Joseph) went around the other side of the apartment building to watch the back exit. Tr. 23:14–21. Officer Hiller observed Robinson open a window on the top floor, lean out the window, and throw a gun from it. *Id.* 24:23–24. As captured by body-worn camera footage introduced by the government, Officer Hiller told the other officers "he just threw it out the back, I see it, 1-800[1]" and that he could identify the man as "the man that ran in[to the apartment building]." Gov't Exs. 10, 13. Officer Joseph testified that although he did not see Robinson throw the gun, he did observe an airborne object fall from a top floor window and into the bushes behind the building. Tr. 23:23–24:6. As Officer Joseph walked toward the bushes to investigate, he looked at the apartment building and

---

[1] "1-800" is a term used by GRU officers to indicate the presence of a firearm. Tr. 34:17–19.

observed Robinson standing in the window from which the object had fallen. *Id.* 24:11–16. Officer Joseph testified that, at that time, Robinson closed the window and retreated into the apartment. *Id.*

The three officers inside the building heard Officer Hiller's observations over the radio and asked him to indicate in which apartment he had observed Robinson. Tr. 39:15–24. After Officer Hiller stated that it was the "top right" apartment, Officer Jacobs broke down the door to Apartment 302. Gov't Exs. 11, 12; Tr. 46:17–47:3. The officers arrested Robinson and temporarily detained two other individuals, including Juan Thurston (the leaseholder). Gov't Ex. 12; Tr. 202:7–9. A few minutes later, Officer Hiller entered the apartment, identified the window in which he had observed Robinson, and identified Robinson (who by that time was already in handcuffs) as the person who had thrown the firearm out the window. Gov't Ex. 9; Tr. 47:13–23. Officer Joseph also entered the apartment and identified Robinson (who was still in handcuffs) as the person he had seen in the window. Gov't Ex. 9; Tr. 44:12–45:1.

A loaded Glock 23 .40 caliber semiautomatic handgun and extended magazine were recovered from the bushes. Tr. 28:14–22. Robinson was indicted on one count of unlawful possession of a firearm and ammunition by a felon in violation of 18 U.S.C. § 922(g)(1). *See generally* Indictment. He is detained pending trial. Detention Order at 3–4, ECF No. 3.

## II. Robinson's Motion to Suppress

Robinson moves to suppress his arrest, "any subsequent physical evidence," and Officers Hiller and Joseph's in-court and out-of-court identifications. *See generally* Def.'s Mot.

### A. Fourth Amendment Challenge

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.

The prohibition against unreasonable seizures requires that all seizures, even ones involving "only a brief detention short of traditional arrest," be founded upon reasonable, objective justification. *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975). Robinson argues that his arrest and the officers' entry into Apartment 302 were unlawful because they were not based on probable cause and because the officers did not have a warrant. Def.'s Mot. at 5–8.

### 1. The Arrest

A Fourth Amendment seizure occurs when an officer, "by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968). To determine whether a citizen's liberty has been restrained, the Court asks whether "a reasonable man, innocent of any crime," would have believed himself free to leave. *United States v. Goddard*, 491 F.3d 457, 460 (D.C. Cir. 2007) (per curiam). If a person is seized by show of authority (instead of by physical force), the seizure does not occur until the subject has submitted to the assertion of authority. *California v. Hodari D.*, 499 U.S. 621, 626 (1991).

Whether a seizure is reasonable depends on the type of seizure at issue. Officers need probable cause to make a warrantless arrest, *see Maryland v. Pringle*, 540 U.S. 366, 370 (2003), but are permitted to "'briefly detain a citizen' where they 'ha[ve] a reasonable, articulable suspicion that criminal activity may be afoot,'" *United States v. Delaney*, 955 F.3d 1077, 1081 (D.C. Cir. 2020) (quoting *United States v. Edmonds*, 240 F.3d 55, 59 (D.C. Cir. 2001)).

But not all interactions between police officers and citizens amount to a "seizure," and these evidentiary requirements are triggered only when a Fourth Amendment seizure has occurred. *United States v. Gross*, 784 F.3d 784, 786 (D.C. Cir. 2015). In deciding whether a seizure has occurred, the Court of Appeals has looked to the factors listed by Justice Stewart in *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (plurality opinion): "the threatening presence of several

4

officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." The Court also considers "the demeanor of the approaching officer," *Gomez v. Turner,* 672 F.2d 134, 144 (D.C. Cir. 1982), "whether the officer . . . wore a uniform," and "the time and place of the encounter," *United States v. Wood,* 981 F.2d 536, 539 (D.C. Cir. 1992).

A seizure does not occur simply because police officers approach an individual. For example, in *Goddard*, the Court of Appeals concluded that a seizure had not occurred even where four officers "jumped out" of their car and approached four men "with guns and handcuffs showing and wearing identifiable MPD jackets and badges." 491 F.3d at 461. This holding turned, in part, on the fact that the officers did not impede the defendant's movement. *Id.*

Here, Robinson was not subjected to a seizure within the meaning of the Fourth Amendment when Officers Kelly, Jacobs, and Davies initially approached him. Those officers drove up to the apartment building, exited the car, and started walking toward the front door. At that point, they had said nothing to Robinson; had given no indication that he was not free to leave; had not used physical force; and had not engaged in any "show of authority" sufficient to constitute a seizure (and Robinson's flight clearly did not submit to that authority). Robinson's argument that the police seized him at that time, and without probable cause, lacks merit.

A seizure did occur later, when the officers broke down the door to the apartment, ordered its occupants (including Robinson) to put their hands up and get on the ground, and Robinson submitted to those commands. Robinson argues that even then the officers did not have probable cause. Def.'s Suppl. at 8–10, ECF No. 40. Although the probable-cause standard cannot be precisely defined or quantified, *see Pringle*, 540 U.S. at 371, "[t]he substance of all the definitions of probable cause is a reasonable ground for belief of guilt," *id.* (quoting *Brinegar v. United States*,

338 U.S. 160, 175 (1949)). The test is an objective one: "probable cause exists if the totality of the circumstances, as viewed by a reasonable and prudent police officer in light of his training and experience, would lead that police officer to believe that a criminal offense has been or is being committed." *United States v. Green*, 670 F.2d 1148, 1152 (D.C. Cir. 1981). "Probable cause may be based on the 'collective knowledge of the police'" and does not require one officer to individually have firsthand knowledge of all the facts amounting the probable cause. *See United States v. Burnett*, 827 F.3d 1108, 1114 (D.C. Cir. 2016) (quoting *United States v. Hawkins*, 595 F.2d 751, 752 n.2 (D.C. Cir. 1978)).

Several factors may serve as indicators of criminal activity (although, in isolation, may not be sufficient to establish probable cause). "Headlong" or "unprovoked flight" can suggest wrongdoing but does not, on its own, give rise to probable cause. *United States v. Stubblefield*, 820 F.3d 445, 451 (D.C. Cir. 2016) (citing *Illinois v. Wardlow*, 528 U.S. 119, 124–25 (2000)). And the "type and intensity of past crime in the area" may similarly point to the reasonableness of an officer's belief that a crime has been or is being committed. *See United States v. Gorham*, 317 F. Supp. 3d 459, 464 (D.D.C. 2018); *Wardlow*, 528 U.S. at 124 (officers need not "ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation").

The evidence overwhelmingly establishes that the officers had probable cause to seize Robinson inside the apartment. Officer Kelly had already viewed a live video in which Robinson appeared to be carrying a firearm magazine in the waistband of his jeans. Tr. 18:13–14. Robinson was then located in an area known to the officers as a "violent neighborhood," *id.* 17:23; upon seeing officers pull up to the apartment building, Robinson turned and fled inside while clutching his waistband, *id.* 23:4–6; he ignored officers' commands to stop and ran into a top-floor

apartment, Gov't Ex. 11; he threw a gun from the window of that apartment, Tr. 23:23–24:16; Gov't Ex. 9; and only after Officer Joseph confirmed that the tossed object was a firearm did the officers enter Apartment 302 and arrest Robinson, Gov't Ex. 9. Taken together, these facts clearly established probable cause that Robinson was engaged in criminal activity at the time of his arrest.

### 2. Apartment Entry

Robinson also challenges the warrantless entry into Apartment 302. Def.'s Mot. at 8. But to do so, Robinson must have a cognizable Fourth Amendment right at stake. *See United States v. McCarson*, 527 F.3d 170, 172–73 (D.C. Cir. 2008). He admittedly does not reside in that apartment, but relies on *Minnesota v. Carter*, 525 U.S. 83, 90 (1998), in which the Supreme Court recognized that social guests may have standing to challenge an entry into another's home. The *Carter* opinion stated that "an overnight guest in a home may claim the protection of the Fourth Amendment, but one who is merely present with the consent of the householder may not." *Id.* Courts in this District have read *Carter* in light of Justice Kennedy's concurring opinion, which stated that a social guest with a "meaningful connection to [the host's property]" has an expectation of privacy in the host's home. *Id.* at 101.

Robinson argues that he had a Fourth Amendment privacy interest in the apartment because he was an invited guest and is Thurston's close friend. Def.'s Mot. at 8. But his relationship with Thurston and his connection to Apartment 302 are far more attenuated than the connections that this Court has found sufficient to establish a Fourth Amendment privacy interest in a third party's home. *See United States v. Dubose*, No. CRIM.A. 05-0372 JDB, 2006 WL 1030154, at *7 (D.D.C. Apr. 19, 2006), *on reconsideration in part*, No. CRIM.A.05-0372(JDB), 2006 WL 1876999 (D.D.C. July 5, 2006) (finding legitimate expectation of privacy in backyard when owner was defendant's mother, defendant regularly visited, and left personal items there believing that they

7

wouldn't be disturbed); *United States v. Leake*, No. 19-CR-194 (KBJ), 2020 WL 3489523, at *7 & n.16 (D.D.C. June 26, 2020) (recognizing that invited guest can sometimes assert common-law property interests of host but noting that the issue is unresolved and suggesting that overnight presence may be important); *see also Collins v. Virginia*, 138 S. Ct. 1663, 1168 & n.1 (2018) (suggesting defendant might have Fourth Amendment privacy interest in girlfriend's house where defendant stayed "a few nights per week"). At the suppression hearing, Thurston testified that Robinson was a "very good friend" he had known for many years, Tr. 203:24–204:1, that Robinson was a frequent visitor, *id.*, and that Robinson was an invited guest on September 29, *id.* 205:2–21. But Robinson has no familial or romantic connection to Thurston, *id.* 208:25–209:6, kept no belongings at the apartment, *id.*, was not an overnight guest on the day of his arrest, *id.* 205:16, and did not have keys, *id.* at 204:25–205:1. Thurston's testimony also failed to establish that Robinson was an invited guest during the afternoon of September 29. Thurston described Robinson as arriving at his apartment at ten or eleven in the morning, *id.* 211:7–10, then leaving when he decided he did not want to play the game Thurston was playing, *id.* 211:21–22. Thurston later saw Robinson outside, *id.* 212:9–10, and "here or there" around the apartment complex after that, *id.* 212:18–24. And although Thurston testified that Robinson was supposed to return a set of borrowed car keys about thirty minutes prior to the arrest, *id.* 213:12–214:8, there is no indication that Robinson was a guest in the apartment at any time that afternoon. In light of these facts, Robinson cannot demonstrate that his connection to the apartment was sufficient to establish a Fourth Amendment privacy right that would enable him to challenge the officers' entry.

But even if he did, exigent circumstances justified the warrantless entry. "When the totality of circumstances shows an emergency—such as imminent harm to others, a threat to the officer himself, destruction of evidence, or escape from the home—the police may act without waiting."

*Lange v. California*, 594 U.S. __ (2021). Although the Fourth Amendment generally requires law enforcement to secure a warrant before effecting a search or seizure inside a home, *see Kentucky v. King*, 563 U.S. 452, 459 (2011), "the ultimate touchstone of the Fourth Amendment is 'reasonableness,'" *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (quoting *Flippo v. West Virginia*, 528 U.S. 11, 13 (1999) (per curiam)), and the warrant requirement is subject to certain reasonable exceptions, *id.* One such exception permits officers to enter a premises without a warrant to prevent imminent destruction of evidence. *King*, 563 U.S. at 460. That is certainly the case here: officers observed Robinson flee into the building while clutching at his waistband, where he had been seen carrying a firearm in two Instagram live videos that day. Officers then observed Robinson attempt to discard the firearm by throwing it out the window and into the bushes behind the apartment building. The officers saw the gun fall from the apartment and into the bushes; that certainly provided clear reason to believe that Robinson was actively attempting to destroy evidence of criminal activity. Thus, even if Robinson had a Fourth Amendment right in Apartment 302, the officers' entry was justified by exigent circumstances.

### 3. The Evidence

Robinson's Fourth Amendment arguments therefore fail. But even if they had merit, the firearm (and ammunition) recovered in this case was not derived from the arrest or the entry and would not be suppressed.

As relevant here, evidence derived from an illegal search or seizure is inadmissible, subject to three exceptions: (1) if it was discovered from a source independent of the illegal activity, *Nix v. Williams*, 467 U.S. 431, 443 (1984), (2) its discovery was inevitable, *id.* at 447–48, or (3) its discovery is attenuated from the illegality, *Utah v. Strieff*, 136 S. Ct. 2056, 2059 (2016). Robinson argues that the gun should be suppressed because the officers' initial approach (in front of the

9

apartment building) was unconstitutional and based on a "hunch" arising out of the Instagram Live video. Def.'s Mot. at 7–8. But there is no general suspicion requirement for officers to approach citizens in public, *see Goddard*, 491 F.3d at 461, and as discussed above, the officers' conduct did not violate the Fourth Amendment.

Moreover, the firearm is not a fruit of Robinson's arrest. *California v. Hodari D.*, 499 U.S. 621, 629 (1991), is instructive. In that case, a suspect tossed crack cocaine while fleeing from police and before his arrest. *Id.* at 622–23. The Court held that the cocaine was not the fruit of a seizure because it was abandoned while the defendant was running and before he was seized. *Id.* at 628–29. In a similar vein, the Court of Appeals has recognized that a defendant forfeits any reasonable expectation of privacy in abandoned property, *United States v. Lewis*, 921 F.2d 1294, 1302 (D.C. Cir. 1990), and that the police may seize such abandoned property without a warrant unless there is a "direct nexus" to an illegal seizure, *see United States v. Wood*, 981 F.2d 536, 541 (D.C. Cir. 1992).

Here, Robinson abandoned the firearm when he tossed it out the window and there is no "direct nexus" to any Fourth Amendment violation. In fact, the evidence conclusively establishes that the gun was thrown to the ground before the officers entered Apartment 302. The recovery of the firearm was not the fruit of Robinson's arrest and should not be suppressed.

## B. Due Process Challenge

Robinson's final argument is a due process challenge to the identifications made by Officers Hiller and Joseph. Def.'s Mot. at 12–16. He argues that the identifications are unreliable and were made in an unreasonably suggestive environment. *Id.*

When examining whether an identification complied with due process, the Court asks whether the identification procedures were "impermissibly suggestive," *United States v. Rattler*,

10

475 F.3d 408, 411 (D.C. Cir. 2007) (quoting *United States v. Washington*, 12 F.3d 1128, 1134 (D.C. Cir. 1994)), and if so, whether, under the totality of the circumstances, the identification was "sufficiently reliable to preclude 'a very substantial likelihood of irreparable misidentification,'" *id.* (quoting *Manson v. Brathwaite*, 432 U.S. 98, 116 (1977)). In determining the reliability of an identification, the Court considers

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself.

*Id.* (quoting *Manson*, 432 U.S. at 114). And "[i]mmediate on-the-scene showup identifications, while recognized as inherently suggestive, have long been upheld by this court." *United States v. Singleton*, 702 F.2d 1159, 1165–66 (D.C. Cir. 1983) (discussing identification in context of evidence supporting guilty verdict).

Robinson contends that Officers Hiller and Joseph's identifications were impermissibly suggestive because the officers had seen him previously in the Instagram Live video and because he was detained, handcuffed, and surrounded by uniformed officers at the time of the identifications. Def.'s Mot. at 12–13. He also argues that Officer Joseph's identification was made in an unduly suggestive environment because Officer Joseph overheard Officer Hiller's identification. *Id.* It is true that Officer Joseph probably overheard Officer Hiller's identification (before Officer Joseph made his own). Gov't Ex. 9 (identifications at approximately 17:48:47 and 17:48:51, respectively). But the evidence establishes that the identifications were reliable. Both officers, while looking for an individual matching Officer Kelly's lookout, had an opportunity to witness Robinson outside the apartment building and in the window. They contemporaneously

11

described their observations over the radio. Gov't Exs. 9, 10. Each officer made his identification without any prompting and without expressing any doubt. Gov't Ex. 9.

Robinson also argues that a previous adverse credibility determination against Officer Hiller is evidence of the unreliability of the identifications, Def.'s Mot. at 14–15, but a witness's credibility is a matter for the jury, *see Bush v. United States*, 375 F.2d 602, 604 (D.C. Cir. 1967) (leaving the veracity of a witness to be determined by the jury). And Robinson has not provided any evidence indicating that the prior credibility issue impacts the reliability of the identifications in this case. *See* Def.'s Mot. at 15–16. There is nothing to suggest that these identifications were more suggestive than any show-up identifications that courts routinely deem admissible; Robinson has certainly not provided enough evidence to render the officers' identifications unreliable. The identifications therefore survive Robinson's due process challenge.

### III. Conclusion

For the reasons discussed above, the Court denies Robinson's Motion to Suppress in full. An Order will be issued contemporaneously with this Memorandum Opinion.

DATE: July 1, 2021

CARL J. NICHOLS
United States District Judge